IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEAF TRADING CARDS, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:17-cv-3200 |
| v. | § | |
| | § | |
| THE UPPER DECK COMPANY, | § | JURY TRIAL DEMANDED |
| | § | |
| Defendant. | § | |

### ORIGINAL COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Leaf Trading Cards, LLC ("Leaf") brings this action against The Upper Deck Company ("Upper Deck") for violation of the antitrust laws on the United States.

**I.    NEED FOR ACTION**

1.    Through exclusive contracts with the National Hockey League Players Association ("NHLPA") and illegal exclusive dealing arrangements with distributors, Upper Deck has managed to throttle competition in the market for hockey player trading cards. Upper Deck's stranglehold on this market has excluded any potential competitor—including Leaf—from access to the necessary player images and distributors to achieve the scale and efficiencies to compete in the market for hockey player trading cards. Leaf therefore seeks injunctive relief and monetary damages from Upper Deck based on its anticompetitive conduct.

**II.    JURISDICTION AND VENUE**

2.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 15(a) and 28 U.S.C. §§ 1332 and 1337(a) over this action to enforce and obtain damages under the federal antitrust law and because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

3.  This Court has personal jurisdiction over Upper Deck and venue is proper in this court under 15 U.S.C. § 22 because Upper Deck is a corporation that transaction business in this district.

## III. PARTIES

4.  Leaf Trading Cards, LLC is a Texas limited liability company whose members are Gray Family Enterprises, LLC and Brian Gray Enterprises, LLC, both Texas limited liability companies as well. Brian Gray, an individual and citizen of Texas is the sole Member of Gray Family Enterprises, LLC and Brian Gray Enterprises, LLC, which renders Leaf a citizen of Texas.

5.  The Upper Deck Company is, on information and belief, a Nevada corporation with its principal place of business in California. Upper Deck is therefore a citizen of Nevada and California. Upper Deck may be served through its registered agent for service of process, National Registered Agents, Inc. of Nevada, 701 S. Carson Street, Suite 200, Carson City, Nevada 89701.

## IV. FACTUAL BACKGROUND

6.  In 1989, Upper Deck issued its inaugural set of baseball trading cards, providing for the first time a complete set of player trading cards for purchase and collection by fans of all ages.[1] In 1990, Upper Deck expanded its production to include trading card sets for professional hockey players.[2] As the NHLPA admits, "Upper Deck is the exclusive licensed manufacturer of NHLPA and NHL trading cards and is one of the longest active NHLPA licensees dating back to 1990."[3]

7.  Through the NHLPA Group Licensing Program, the NHLPA wields the exclusive right authorize the use, license, and sub-license of every NHL player's name, signature, picture, biographical sketch, playing record, player number and likeness in groups of three or more players

---

[1] http://www.upperdeck.com/Corporate/ (Last accessed November 15, 2017).

[2] http://www.upperdeck.com/History.aspx (Last accessed November 15, 2017).

[3] http://www.nhlpa.com/inside-nhlpa/business-affairs/player-licensed-products (Last accessed November 15, 2017).

across the league on or in any one product or advertisement or series of products or advertisements.[4] No manufacturer of hockey trading cards may produce cards for more than three (3) players absent a license from the NHLPA—a license exclusively held by Upper Deck. At any one time, some 700 players comprise the active rosters of the 31 NHL teams. The exclusive license held by Upper Deck from the NHLPA gives it over 90% control over the multi-million dollar market for hockey player trading cards—the vast majority of which is centered in Canada.

8. And Upper Deck has used its market power to unlawfully stifle competition. In 2017, Upper Deck began demanding that its distributors sign new Exclusive Distributor contracts. On information and belief, through facially innocuous provisions, the new Exclusive Distributor contracts are structured in such a way as to effectively prohibit any Exclusive Distributor who carries Upper Deck hockey player trading card products from buying or selling any hockey player trading card manufactured by Leaf. For instance, the contracts are understood to provide that an Exclusive Distributor cannot carry any hockey trading card product that utilizes a single current NHL player, or any other player as to whom Upper Deck claims to have exclusive rights.

9. Together the following Exclusive Distributors control over 90% of the United States market, and almost 100% of the Canadian market for hockey player trading cards.

- Universal Distribution, the largest distributor throughout Canada with an estimated market share of more than 80% of hockey player trading cards;
- Grosnor Distribution, the second largest Canadian distributor with nearly 20% of the market throughout Canada;
- GTS Distribution, the largest U.S. distributor with over 80% of the market for hockey player trading cards in this country; and
- Southern Hobby Distribution, the second largest distributor of hockey player trading cards in the United States with 15-18% of the American market.

---

[4] Available at http://www.nhlpa.com/inside-nhlpa/collective-bargaining-agreement (Last accessed November 15, 2017), at Article 25, § 25.5(b).

Given the disproportionate share of the market for hockey player trading cards centered in Canada, the Exclusive Distributor contracts effectively foreclose over 90% of the available market, depriving Leaf of obtaining the economy of scale required to effectively compete.

10. Upper Deck's anticompetitive actions vis-à-vis the Canadian market directly impact Leaf, as well as the market (and consumers) in the United States. As noted, the Canadian market dwarfs that of the U.S. for hockey player trading cards. The Exclusive Distributorship contracts insisted upon by Upper Deck preclude Leaf from successfully penetrating the critical Canadian market, which in turn prevents Leaf from achieving the efficiencies necessary to compete in the hockey player trading card market in the United States.

11. In addition, Upper Deck has told retail sellers of its hockey player trading cards that if they were to carry potentially competing Leaf products, those retailers could face retribution in the form of lost status and purchasing benefits. This problem is compounded by the terms of the non-disclosure covenants insisted on by Upper Deck with its Exclusive Distributors who are prohibited from telling retailers <u>why</u> those major distributors do not carry Leaf products, leading to a perception by retailers that Leaf products are not sold by the Exclusive Distributors because Leaf products are inferior.

12. Also on information and belief, Leaf understands that Upper Deck has used its powerful position in the hockey player trading card market to harm Leaf by (a) having the NHLPA interfere in Leaf's private negotiations with one or more NHL players in an effort to stifle Leaf's ability to compete in the securing of NHL athletes for its products, and (b) having the NHL forbid Getty Images and other photo licensing agencies from providing photographs to Leaf to further hinder Leaf's ability to compete. The combination of the NHLPA Group Licensing Program, the exclusive licensing agreement between the NHLPA and Upper Deck, and the provisions of the NHL/NHLPA

collective bargaining agreement have allowed Upper Deck to eliminate virtually all competition in the hockey player trading card market.

13. Also on information and belief, Leaf understands that Upper Deck employees have (a) used confidential or false internet personas to erroneously and maliciously spread misinformation and negative reviews of Leaf products, (b) compensated dealers and consumers to erroneously and maliciously spread misinformation and negative reviews of Leaf products, and (c) compensated dealers to discontinue carrying Leaf products, all in an effort to harm Leaf and to restrain trade and eliminate competition.

14. Upper Deck's actions have harmed not only Leaf in its business, and consumers in the United States and Canada, it has harmed the competitive process and competition itself. By its actions, designed to achieve and/or maintain monopoly power through conduct that excludes competition, Upper Deck has violated federal law.

15. Indeed, Upper Deck's predatory anticompetitive behavior has been, in part, employed as a vehicle for attempting to devalue and financially harm Leaf so that Upper Deck could to acquire Leaf's assets for pennies on the dollar, thus creating the purest possible monopoly.

16. That motive was laid bare when Upper Deck induced Leaf to provide valuable confidential information regarding Leaf's business by fraudulently asserting an interest in purchasing Leaf's hockey assets. Upper Deck's subsequent actions clearly show its prior "interest" was a false pretext to further harm Leaf.

17. Leaf therefore seeks injunctive relief prohibiting such anticompetitive conduct by Upper Deck, a declaration that the Exclusive Distributor are void insofar as they prohibit any distributor from buying or selling any hockey player trading card manufactured by Leaf, and monetary damages in an amount to be proven at trial, but certainly in excess of $75,000.00.

## V.  CAUSES OF ACTION

### Count 1 – Violation of the Sherman Act (15 U.S.C. § 1).

18. Leaf re-alleges and incorporates all the above allegations as if fully set forth herein.

19. Upper Deck's use of Exclusive Distributor contracts, especially in combination with its agreement with the NHLPA for the exclusive right to use every NHL player's name, signature, picture, biographical sketch, playing record, player number and likeness in groups of three or more players across the league to manufacture hockey player trading cards, unreasonably retrain trade in the market for hockey player trading cards in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

20. Upper Deck's use of Exclusive Distributor contracts, combined with its dominant market position, the highly concentrated distributor structure, the anticompetitive market effects, and the lack of potential justifications, confirm Upper Deck's actions as unreasonable restraints of trade. Upper Deck has exercised market power through these contracts and its exclusive license from the NHLPA to control supply, elevate prices, and exclude competition in the market for hockey player trading cards.

21. Upper Deck's actions have directly harmed Leaf in its business, as well as consumers the competitive process, and competition itself in both the United States and Canada.

### Count 2 – Violation of the Sherman Act (15 U.S.C. § 2).

22. Leaf re-alleges and incorporates all the above allegations as if fully set forth herein.

23. By employing Exclusive Distributor contracts, especially in combination with its agreement with the NHLPA for the exclusive right to use every NHL player's name, signature, picture, biographical sketch, playing record, player number and likeness in groups of three or more players across the league to manufacture hockey player trading cards, Upper Deck has monopolized, attempted to monopolize, or combined or conspired with another person or persons to attempt to

monopolize the trade or commerce among the several States, or with foreign nations, specifically the market for hockey player trading cards, in violation of 15 U.S.C. § 2.

24. Upper Deck's actions have directly harmed Leaf in its business, as well as consumers the competitive process, and competition itself in both the United States and Canada.

**Count 3 – Violation of the Clayton Act (15 U.S.C. § 14).**

25. Leaf re-alleges and incorporates all the above allegations as if fully set forth herein.

26. By using Exclusive Distributor contracts, especially in combination with its agreement with the NHLPA for the exclusive right to use every NHL player's name, signature, picture, biographical sketch, playing record, player number and likeness in groups of three or more players across the league to manufacture hockey player trading cards, Upper Deck has engaged in commerce and in the course of such commerce, made a sale or contract for sale of goods, wares, merchandise, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States, on the condition, agreement, or understanding that the purchaser thereof shall not use or deal in the goods, wares, merchandise, or other commodities of a Leaf, where the effect of such sale or contract for sale or such condition, agreement, or understanding was to substantially lessen competition or tend to create a monopoly in the market for hockey player trading cards, in violation of 15 U.S.C. § 14.

27. Upper Deck's actions have directly harmed Leaf in its business, as well as consumers the competitive process, and competition itself in both the United States and Canada.

## VI. DEMAND FOR JURY

28. Leaf hereby demands trial by jury.

## VII. REQUESTED RELIEF

WHEREFORE, Leaf Trading Cards, LLC, prays that final judgment be entered against The Upper Deck Company declaring, ordering, and adjudging that:

a. The aforesaid Exclusive Distributor contracts unreasonably restrain trade and are illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

b. The aforesaid Exclusive Distributor contracts unreasonably restrain trade and are illegal under Section 2 of the Sherman Act, 15 U.S.C. § 2;

c. The aforesaid Exclusive Distributor contracts are acts in commerce where the effect was to substantially lessen competition or tend to create a monopoly in any line of commerce, which is illegal under the Clayton Act, 15 U.S.C. § 14;

d. Upper Deck be permanently enjoined from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the aforesaid Exclusive Distributor contracts or any other agreement having similar purposes or effects in violation of 15 U.S.C. §§ 1-2;

e. That Leaf recover damages, as provided by the law, and the amount of such damages be trebled;

f. That Leaf recover its attorney's fees in accordance with and pursuant to 15 U.S.C. § 15c(a)(2) and 15 U.S.C. § 26; and

g. That Leaf be granted such other relief to which it may show itself entitled.

Dated: November 22, 2017

Respectfully submitted,

/s/ Warren T. Burns
Warren T. Burns
State Bar No. 24053119
Daniel H. Charest
State Bar No. 24057803
E. Lawrence Vincent
State Bar No. 20585590

BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dcharest@burnscharest.com
lvincent@burnscharest.com

Counsel for Leaf Trading Cards, LLC